# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 7 |
| | Case No. 17-31052 |
| RICHARD M. SHOVE | |
| KATHLEEN E. SHOVE, | |
| Debtors | |
| JOSE R. HERNANDEZ, | Adversary Proceeding |
| Plaintiff | No. 18-03009 |
| v. | |
| RICHARD M. SHOVE, | |
| KATHLEEN E. SHOVE, | |
| Defendants | |

## <u>MEMORANDUM OF DECISION</u>

Before the Court, after trial, is a complaint filed by judgment creditor Jose R. Hernandez

("Hernandez") against Richard M. Shove ("Shove"), a debtor in the underlying joint Chapter 7

bankruptcy case.  In this adversary proceeding, Hernandez seeks (1) a ruling that a judgment

entered in favor of Hernandez against Shove is nondischargeable pursuant to 11 U.S.C. § 523(a)(6)

as a debt incurred on account of a willful and malicious injury or (2) in the alternative, a denial of

Shove's discharge under 11 U.S.C. § 727 (a)(2), (a)(3), and (a)(4)(A).[1]

---

[1] All statutory references in this Memorandum are to provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et al.* (the "Bankruptcy Code" or the "Code"), unless otherwise noted.  And, unless otherwise indicated, all references to the "Rules" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.

Pursuant to Bankruptcy Rule 7052, the following constitute the Court's findings of fact and conclusions of law.

I.        FACTS AND POSITIONS OF THE PARTIES

The factual findings contained in this Memorandum are based on trial testimony, the admitted evidence, and the Court's own records.  *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999).  The following is a brief summary of the relevant facts; more detailed findings of fact are incorporated in the Discussion section, Part II, below.

Shove operated a landscaping and lawn care business referred to in the bankruptcy schedules and statements as both "Rick's Complete Lawn and Landscaping Service" and "Rick's Complete Lawn Care" ("Rick's Complete"), employing 3 to 4 employees per year, for at least 25 years prior to the business's demise in 2015.  During that time, from 1996 to the present, Shove has also owned a total of approximately 90 rental units.  On February 11, 2015, Hernandez was severely injured during the course of his employment by Shove and Rick's Complete.[2]  Shove did not have a workers' compensation policy in effect at the time of the injury.  Hernandez filed suit against Shove in the Massachusetts Superior Court (the "Superior Court") and received a $965,201.53 verdict in his favor on September 20, 2017 ("the Hernandez judgment").  Meanwhile, on May 6, 2016, while the Superior Court case was pending and after Hernandez had moved for a real estate attachment, Kathleen Shove ("Kathleen"), Shove's spouse (together, the "Shoves"), executed three promissory notes and mortgages on properties jointly owned by Shove and

---

[2] At trial, Shove testified that Hernandez was *not* employed by Shove and Rick's Complete at the time the injury occurred.  However, Shove had already stipulated that Hernandez was Shove's employee on the date of the injury.

Kathleen in favor of Kathleen's father, Thomas McDowell ("McDowell"), ostensibly to document and secure prepetition debts on account of moneys lent to the Shoves prepetition.[3]

On December 15, 2017, the Shoves filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code and Jack E. Houghton was appointed the Chapter 7 trustee on December 18, 2017 (the "Trustee").  Although Shove acknowledged understanding the importance of providing accurate information in his bankruptcy documents and the fact that the documents were signed under the pains and penalty of perjury, Shove testified that he did not read his bankruptcy documents "word for word" before filing his case.  Trial Tr. 169:11-20, Feb. 24, 2020 ("Feb. 24 Tr.").

In the schedules and statements, the Shoves indicated that their debts were not primarily consumer debts.[4]  On Schedule A/B, the Shoves disclosed joint ownership of their primary residence located in Lenox, Massachusetts (the "Residence"), 5 jointly owned multi-unit properties located in Lenox, a jointly owned single family home located in Lee, Massachusetts, and 2 multi-unit properties owned solely by Shove located in Pittsfield, Massachusetts.  Schedule D indicates that the secured claims against the properties exceed $1.7 million, and approximately $540,000 of the unsecured debt listed on Schedule E/F is described as "mortgage" or "mortgage deficiency" debt.

On Schedule I, Shove indicated that he was employed by Cut-N-Edge Property Maintenance as a manager, grossing $747.50 per month, and that he also received unemployment

---

[3] Those mortgages have since been declared null and void pursuant to a postpetition ruling of the Superior Court in a separate action.  After McDowell passed away, Hernandez commenced suit against McDowell's probate estate claiming that the mortgages were part of a scheme to defraud Hernandez.  The probate estate failed to respond and a default judgment entered on July 10, 2019.

[4] "Consumer debt" is defined as "debt incurred by an individual primarily for a personal, family, or household purpose."  11 U.S.C. § 101(8).

compensation.  In addition, on Schedule I, the Shoves listed combined net monthly rental income of $1,056.59, based on aggregate monthly rental income of $4,625 less expenses of $3,568.41. Notably, the Shoves did not list the rental income on line 8a of Schedule I, which asks for "[n]et income from rental property and from operating a business, profession or farm" and instructs the debtor to attach a statement for each rental property showing gross receipts, ordinary and necessary business expenses, and the total monthly net income.  Instead, the rental income is listed on line 8h ("other income"), which does not require a separate supporting attachment.

On January 29, 2018, the Trustee conducted an initial meeting of creditors as required by § 341 of the Bankruptcy Code ("meeting of creditors") and a continued meeting of creditors in May 2018.  The Trustee requested and received additional information from the Shoves related to their financial affairs, but the Shoves have filed no further amendments to their bankruptcy schedules and statements.  On December 16, 2020, the Trustee noted on the docket of the main bankruptcy case that there were no assets available for distribution to creditors.

On March 23, 2018, Hernandez commenced this adversary proceeding, and later filed a five count amended complaint (the "Complaint").  Through Counts I-IV, Hernandez seeks a ruling that the Hernandez judgment is nondischargeable pursuant to § 523(a)(6) and that the Shoves' discharge should be denied pursuant to § 727(a)(2), (3), and (4).  Count V of the Complaint, which sought the avoidance of the mortgages granted by Kathleen to McDowell as fraudulent transfers, was dismissed by the Court**.**  Hernandez agreed to the dismissal of the Complaint in its entirety as to Kathleen.

A trial was conducted over 5 days in February and March 2020 and, as requested by the Court, the parties have both filed post-trial briefs. Seven witnesses testified at trial – Hernandez, Shove, Kathleen, Mychal Shove ("Mychal," the Shoves' son), Andrew Farrell ("Farrell," a former

tenant of the Shoves), the Trustee, and William Barry ("Barry," the attorney that represented Shove in the Superior Court case and assisted Kathleen with drafting the promissory notes and mortgages to McDowell).

The testimony provided by Hernandez, Farrell, and Barry was credible and forthright, as was the Trustee's testimony to the extent the Trustee had a clear memory of the facts in relation to the presented questions. When applicable, the Trustee readily indicated particular facts he was unable to recall. Mychal's testimony was largely credible, although some responses seemed rehearsed and contrived to adhere to a "script."[5] Both Shove and Kathleen at times appeared condescending and visibly frustrated by Hernandez's counsel. Their testimony was, as described below, credible in some respects, but often incomplete or evasive by way of opportunistic purported confusion. During direct examination by Hernandez's counsel, Kathleen often responded to a question with "okay" or "I guess" or by presenting a retorting question.

In the Complaint and his post-trial brief, Hernandez contends that, because Shove willfully and maliciously caused Hernandez's injury, the Hernandez judgment should be excepted from discharge pursuant to § 523(a)(6). In addition, Hernandez argues that Shove's discharge should be denied in its entirety (1) pursuant to § 727(a)(2)(A) because Shove concealed property within the year preceding the bankruptcy filing with the intent to hinder, delay, or defraud Hernandez; (2) pursuant to § 727(a)(3) on account of Shove's concealment, destruction, or failure to keep financial records; and (3) pursuant to § 727(a)(4)(A) as a result of various false oaths Shove made in or in connection with his bankruptcy case. Not surprisingly, Shove denies that the injury incurred by Hernandez was on account of any willful or malicious action taken by Shove, that Shove concealed

---

[5] For example, in connection with tuition payments made by the Shoves prepetition (discussed in greater detail later), Mychal disputed Hernandez's counsel's reference to "that debt" (a debated characterization), emphasizing that the outstanding tuition "wasn't debt. It was just a school bill." Trial Tr.132:18-20, March 10, 2020 ("March 10 Tr.").

or destroyed property or records, that Shove failed to keep adequate financial records, or that Shove knowingly and intentionally made any false representations in connection with the bankruptcy case.

II.     DISCUSSION

A.     **Count I - 11 U.S.C. § 523(a)(6): Willful and Malicious Injury**

Hernandez was periodically employed by Shove to perform landscaping and other related work for several years prepetition.  On February 11, 2015, Shove instructed Hernandez to go to a property located at "the Condos"[6] to shovel snow off of a customer's roof.   According to Hernandez, who had never previously performed such a task, Shove insisted that Hernandez shovel from the roof despite Hernandez's resistance due to his expressed fear of falling, reassuring Hernandez that two employees would later join Hernandez to assist him.  Shove testified that he would not send someone up on a roof alone due to the obvious danger of falling and said that his practice was to use a snow rake from the ground to remove snow from a roof.   Hernandez testified, however, that Shove pressured him into performing the work on the roof alone. The Court credits Hernandez's testimony and finds that Shove instructed Hernandez to shovel snow from a client's roof.  Because he needed to keep his job to support his family, Hernandez obliged.

According to Hernandez, he used a map hand drawn by Shove to drive to the Condos by himself and locate the property.  When there, Hernandez used a ladder to get onto the metal roof and began shoveling snow without a harness or rope to prevent him from falling.   Unfortunately, Hernandez's trepidation was warranted; Hernandez fell from the roof into an outside area enclosed by a fence, where he was non-ambulatory, in substantial pain, and had incurred a significant injury.

---

[6] "The Condos" consists of single family residences located on a golf course in Lenox, MA.  Feb. 24 Tr. 164:4-19; March 10 Tr. 13:19-21, 16:11-13.

Hernandez was able to reach Shove by phone, after which Shove and Mychal drove to Hernandez's location and transported the injured Hernandez from the Condos to Shove's home. Hernandez testified that Shove refused to pay Hernandez for his work on February 11, 2015 since, according to Shove, Hernandez had gone to the wrong residence.

At the time of Hernandez's injury, Shove did not have a workers' compensation insurance policy in effect. After the Superior Court trial, a jury rendered a verdict in Hernandez's favor, finding that Hernandez had sustained personal injury or harm arising out of his employment by Shove. Judgment in the amount of $965,201.53 entered on September 20, 2017, which is now final and remains unpaid.

Hernandez contends that Shove willfully and maliciously caused Hernandez's injury by ordering Hernandez, his employee, to access and remove snow from a roof without protection and over Hernandez's objection, which resulted in Hernandez's fall. Accordingly, Hernandez says, the judgment should be excepted from discharge pursuant to § 523(a)(6).

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). The Supreme Court has held that "[t]he word 'willful' in § 523(a)(6) modifies the word 'injury,'" indicating that § 523(a)(6) "requires proof of a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). "Intentional torts generally require that the actor intend 'the *consequences* of any act,' not simply 'the act itself.'" *Id.* at 61-62 (citing Restatement (Second) of Torts § 8A) (emphasis in original). "In light of the Supreme Court's citation to the Restatement (Second) of Torts*,* courts have concluded that the Supreme Court meant the willfulness element to include actions intentionally done and known by the debtor to be 'substantially certain to cause injury.'" *B.B. v. Bradley (In re*

*Bradley)*, 466 B.R. 582, 587 (B.A.P. 1st Cir. 2013) (internal quotations and citation omitted).

Therefore, "a debtor who intentionally acts in a manner he knows, or is substantially certain, will

harm another may be considered to have intended the harm and, therefore, to have acted willfully

within the meaning of § 523(a)(6)." *O'Rorke v. Porcaro (In re Porcaro)*, 545 B.R. 384, 396

(B.A.P. 1st Cir. 2016) (quoting *McAlister v. Slosberg (In re Slosberg)*, 225 B.R. 9, 19 (Bankr. D.

Me. 1998)).

Regarding the element of malice in § 523(a)(6), the United States Court of Appeals for the

First Circuit has held that "[a]n injury to an entity or property may be a malicious injury within

this provision if it was wrongful and without just cause or excuse, even in the absence of personal

hatred, spite or ill-will." *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir. 1997)

(quoting 4 Collier on Bankruptcy ¶ 523.12 (15th ed.1996)). Accordingly,

> for an exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has
> the burden of showing by a preponderance of the evidence, *see Grogan v. Garner,*
> 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that 1) the creditor suffered
> injury; 2) the debtor intended to cause the injury or that there was substantial
> certainty that the injury would occur; and 3) the debtor had no justification or
> excuse for the action resulting in injury.

*Bauer v. Colokathis (In re Colokathis),* 417 B.R. 150, 158 (Bankr. D. Mass. 2009).

Hernandez bears the initial burden of showing that Shove caused Hernandez to suffer an

injury. There is no dispute that Hernandez suffered an injury on February 11, 2015 while acting

as Shove's employee. Hernandez says that Shove's insistence that Hernandez climb onto the

snow-covered roof alone, without protective equipment, and over Hernandez's objections, led to

Hernandez's injury.[7] Hernandez credibly testified that he feared losing his job if he did not comply

---

[7] In Hernandez's post-trial brief, Hernandez clarified that he does not claim that Shove's failure to have
workers compensation insurance is a basis to except Hernandez's claim from discharge under § 523(a)(6).
Consequently, the Court need not address Shove's reliance on *Roumelius v. Popa (In re Popa)*, 140 F. 3d
317 (1st Cir. 1998) as to Count I.

8

with Shove's instructions.  While Shove denies that he instructed Hernandez to shovel snow from the roof, the Court finds Hernandez's testimony credible and that there is some causal connection between Shove's instruction and Hernandez's injury.

In addition to establishing a causal connection, § 523(a)(6) also requires that Hernandez demonstrate that Shove either subjectively intended to cause Hernandez's injury, or that, objectively, Shove's actions would be substantially certain to cause injury.  As Hernandez testified regarding the events of February 11, 2015, Shove did not accompany Hernandez to the site where Hernandez was injured and Shove was neither at that site demanding that Hernandez get on the roof nor was Shove present when Hernandez fell from the roof.  In fact, when asked whether he believes Shove intended for him to be injured, Hernandez testified "I don't say that." Feb. 24 Tr. 152:11.  Based on these facts, particularly Hernandez's statement that Hernandez does not believe that Shove intended for Hernandez to be injured and the lack of any indication to the contrary, the Court does not find that Shove subjectively intended to cause injury to Hernandez.

However, Hernandez argues that Shove's insistence that Hernandez shovel snow from the roof without protective equipment was, objectively, substantially certain to cause Hernandez's injury.  At trial, Shove acknowledged the inherent danger in sending someone onto a roof alone, proclaimed that he had not done so, and indicated that the type of roof effects the degree of danger. Hernandez credibly testified that on the morning of February 11, 2015, Shove drew Hernandez a map directing Hernandez to the customer's house.  Hernandez says that he went to what he believed was the correct house, but also testified that Shove later stated that Hernandez had gone to the wrong house as grounds for refusing to pay Hernandez.  Based on this testimony, the Court finds that there is a strong possibility that Hernandez went to the wrong house, one with a metal roof.  Inasmuch as Hernandez may have gone to the wrong house, one with a potentially more

dangerous metal roof, the Court finds that Hernandez has failed to establish by a preponderance of the evidence that Shove should have been substantially certain that his instructions would cause injury to Hernandez.  Accordingly, Hernandez has not established, by a preponderance of the evidence, that Shove caused him a "willful and malicious injury" within the meaning of § 523(a)(6) and the Court will enter judgment in favor of Shove as to Count I of the Complaint.

### B.    Counts II, III and IV -  11 U.S.C. § 727: Denial of Discharge

Obtaining a discharge and its concomitant financial fresh start is usually the debtor's primary objective in filing a bankruptcy case under Chapter 7 of the Code.  As such, a denial of discharge has appropriately been described as the "death penalty of bankruptcy." *Washington 1993, Inc. v. Hudson (In re Hudson),* 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009).  Absent proof that one of the grounds for denial of discharge under § 727(a)(1)-(12) exists, § 727 provides that a court must grant a discharge.  11 U.S.C. § 727(a) ("The Court *shall* grant the debtor a discharge, unless . . . .") (emphasis supplied).  "In light of the effect on the [d]ebtor, a denial of discharge is an extreme step that should not be taken lightly . . . , and, therefore, the provisions of § 727 should be construed liberally in favor of debtors. Objections to discharge should be narrowly construed in furtherance of the Bankruptcy Code's fresh start policy[.]" *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 659 (B.A.P. 1st Cir. 2011) (quoting *Annino, Draper & Moore, P.C. v. Lang (In re Lang)*, 246 B.R. 463, 468 (Bankr. D. Mass. 2000), *aff'd*, 256 B.R. 539 (B.A.P. 1st Cir. 2000)). Consequently, in an action objecting to a debtor's discharge, Bankruptcy Rule 4005 places the burden of proof on the objecting party.  The standard of proof for each element of the § 727 provisions is by a preponderance of the evidence, with the objecting party bearing the initial burden of proof and burden of production as to each element.  *See Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir.1987).  "The reasons for denying a discharge to a bankrupt must be real and

10

substantial, not merely technical and conjectural." *Id*. at 110 (quoting *Dilworth v. Boothe,* 69 F.2d

621, 624 (5th Cir.1934)).

Inasmuch as § 727(a)(2) and (a)(4) require a finding of actual intent in order to deny

discharge, the question "will turn on the credibility and demeanor of the debtor." *Groman v.*

*Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002). To be denied a discharge under § 727(a)(3),

there must be no justification under all of the circumstances of the case for the debtor's act or

failure to act.

    1.    <u>Count II - 11 U.S.C. § 727(a)(2)(A): Transfer, Removal, Destruction,
Mutilation, or Concealment of Property with Intent to Hinder, Delay, or
Defraud</u>

Section 727(a)(2)(A) provides that a bankruptcy court should not grant a debtor a discharge

if

    (2)    the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
the estate charged with custody of property under this title, has transferred,
removed, destroyed, mutilated, or concealed, or has permitted to be
transferred, removed, destroyed, mutilated, or concealed –

        (A)    property of the debtor, within one year before the date of the filing
of the petition . . . .

11 U.S.C. § 727(a)(2)(A).[8] Therefore, to prevail on an objection to discharge under

§ 727(a)(2)(A), a plaintiff must prove, by a preponderance of the evidence, *Antognoni v. Basso (In*

*re Basso),* 397 B.R. 556, 562 (B.A.P. 1st Cir. 2008), a "(1) transfer or concealment of property (2)

that belonged to the debtor (3) less than a year before the bankruptcy petition (4) with actual intent

to hinder, delay or defraud a creditor." *Marrama v. Citizens Bank of Massachusetts (In re*

*Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006); *see also Razzaboni v. Schifano (In re Schifano)*, 378

F. 3d 60, 66-67 (1st Cir. 2004).

---

[8] While the Complaint does not specify the subsection of § 727(a)(2) under which Hernandez seeks to deny
Shove's discharge, Hernandez's post-trial brief refers only to subsection (A).

#### a.    McDowell Mortgages

Prepetition, on May 6, 2016, Kathleen executed three mortgages to her father, Thomas McDowell to secure promissory notes executed by Kathleen on the same date (the "McDowell mortgages").    The mortgaged properties were each jointly owned by Kathleen and Shove. According to Hernandez, the granting of the mortgages and their continued encumbrance of the jointly owned properties warrants a denial of Shove's discharge under § 727(a)(2)(A).

While the mortgages constitute "transfers" within the meaning of the Bankruptcy Code, *see* 11 U.S.C. § 101(54); *Martin v. Bajgar (In re Bajgar ),* 104 F.3d 495, 498 (1st Cir. 1997), those transfers were not transfers of *Shove's* property, but of Kathleen's only.    Kathleen is no longer a defendant in this adversary proceeding and the parties have stipulated that the mortgages were executed only by Kathleen.    Therefore, the mortgages encumbered only Kathleen's interest in the properties.    Hernandez has failed to articulate any legal argument that Kathleen's grant of a lien on her interests affects Shove's interests in those properties.    Consequently, the Court concludes that the Plaintiff is unable to establish that the execution of the mortgages warrants a denial of Shove's discharge under § 727(a)(2)(A).

#### b.    Rental Income, Cash on Hand, and Other Personal Property

Hernandez alleges that Shove has concealed assets in the form of cash on hand, rents received, earned income, books, equipment, and personal property in the year prior to the bankruptcy filing.[9]    In support of this allegation, Hernandez appears to rely on (1) Shove's alleged failure to disclose income received from Airbnb during 2017; (2) the decrease in rental income

---

[9] In the Complaint, Hernandez alleges that Shove failed to disclose his operation of and income from Shove's landscaping business and the Shoves' "property management business" in 2015, 2016, and/or 2017 and has hidden rental and other earned income.    Inasmuch as Hernandez fails to refer to any specific property management business separate and apart from the Shoves' management of their rental properties, the Court assumes that management of those rental properties is the "property management business."

disclosed on Schedule I as compared to rental income disclosed on the Shoves' 2013 tax return; (3) Shove's failure to disclose any rental income received from 524 Walker Street in a rent roll provided to the Trustee following the meeting of creditors; and (4) the disclosure of only $30 in cash on hand on the petition date despite Shove's and Kathleen's testimony that rents were received primarily in cash and Shove's testimony that he and Kathleen "have a lot of cash on hand."  Trial Tr. 70:3-4, Feb. 25, 2020 ("Feb. 25 Tr.").

Both Shove and Kathleen testified that they received rental income through Airbnb in 2017 for an apartment above the garage at the Residence (the "Airbnb income").  The Airbnb income was directly deposited into the Shoves' joint bank account ending in 6134 (the "6134 account"), with the exception of $264.61 deposited into Mychal's bank account on December 12, 2017.  Shove testified that the Schedule I average monthly gross income from the rental properties for the 12 months prior to the Shoves' filing included the Airbnb income.

The Trustee testified that he could not recall if the Shoves informed him that they received Airbnb income for the Residence at their initial meeting of creditors and that he first learned of the Airbnb income the week of the trial.  But the Trustee also testified that he could not remember having any discussion with the Shoves' attorney regarding whether a portion of the Residence had been rented.  Kathleen testified that she *did* inform the Trustee of the income received from Airbnb at the meeting of creditors and Shove provided the Trustee with copies of the 6134 account statements from January to December 2017 reflecting the Airbnb deposits.  While (as will be discussed later) the accuracy of Shove's reported rental income is highly questionable, the Court finds that Hernandez has failed to establish that Shove concealed the receipt of Airbnb income during the year preceding the case filing.

Hernandez also emphasizes that Shove's 2013 joint income tax return (the "2013 return")

13

lists gross rent receipts totaling $212,300, while the income reflected on Schedule I discloses only $60,326 in gross rent receipts for 2017. The insinuation appears to be that this indicates concealment of substantial rental income. However, the 2013 return reflects rents received from 16 income producing rental properties, while, as reflected in the Shoves' 2017 joint income tax return (the "2017 return"), the Shoves owned 9 properties, only 6 of which were income producing, in 2017. The rental properties listed in the 2017 return are consistent with the real estate property addresses listed in Schedule A/B. As demonstrated by the mortgage deficiency claims listed in Schedule E/F, the Shoves owned fewer properties in 2017 than in 2013 due to prepetition foreclosures.

As for the rental properties that had not been foreclosed on, some were not producing income. For example, regarding 524 Walker Street, which was not included as an income-producing property in 2017, Farrell, a paying tenant in the property from 2013-2015, credibly testified that he was told by Shove to stop paying rent in light of the impending foreclosure of that property. Farrell further testified that he resided at 524 Walker Street without paying rent until he moved out in mid to late 2018, which was consistent with Shove's testimony. The Trustee also testified that he was aware that, at the time of filing, the 524 Walker Street property had been placed in receivership.

The Court finds that, as to this issue, the Shoves' testimony was credible that the 2017 rental receipts declined as the year progressed and tenants learned of the Shoves' financial problems, including other impending foreclosures. The substantial decrease in rental income from 2013 is adequately explained by the foreclosure of many of the Shoves' properties and the failure of tenants in other properties to pay rent. The Court does not find that Hernandez has established, by a preponderance of the evidence, that Shove concealed rental income received in the year

preceding the bankruptcy filing.

As to cash on hand, Hernandez has similarly failed to demonstrate that Shove concealed cash in the one year prepetition period.  While Shove and Kathleen testified that they often dealt in cash (since they received rental income in the form of cash or via cashed tenant checks) and Hernandez testified that he and other individuals who worked for Shove were paid in cash, there was no evidence that Shove attempted to conceal that cash in the year preceding the bankruptcy filing.  With the exception of the matters further discussed below, there was no evidence presented that Shove concealed other personal property assets or income as referenced in the Complaint. Accordingly, the Court does not find that Shove's discharge should be denied under § 727(a)(2)(A) on account of the concealment of rental income, cash on hand, earned income, or other personal property within one year prior to the bankruptcy filing.

### c.    *Cut-N-Edge*

After graduating from high school, Mychal assisted Shove in the operation of Rick's Complete.   In 2011, Michael started his own landscaping business, Cut-N-Edge Property Maintenance ("Cut-N-Edge"), which he owns and operates as a sole proprietorship.[10]   In connection with the business, Mychal opened a separate Cut-N-Edge bank account, filed a Schedule C (Profit or Loss From Business) with each annual tax return since 2011, and obtained a d/b/a certificate from the town of Lenox in April 2015.

According to Mychal, as of early 2015, Cut-N-Edge had existing customers and business that was distinguishable from Rick's Complete.  In April 2015, as Shove began to wind down the operation of Rick's Complete, Shove sent a letter to Rick's Complete customers noting that

---

[10] A sole proprietorship is "[a] business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity."  *Sole Proprietorship Definition*, Black's Law Dictionary (11th ed. 2019).

Mychal had worked for Shove for three years and informing them of a change in the business name to Cut-N-Edge.  The letter indicated that the landline phone number would be phased out and provided cell phone numbers for both Shove and Mychal.  Pl. Ex. 69.  Mychal testified that following the receipt of the letter, some, but not all, of Rick's Complete customers became Cut-N-Edge customers.

After that, according to Mychal, Shove assisted with the Cut-N-Edge business by speaking to customers, providing job quotes, and once obtained a building permit for a customer's roof repair.  While Shove listed his employment with Cut-N-Edge as a "manager" on Schedule I, Mychal disputed that characterization, implying that Shove's role in the business did not rise to that level.  Mychal testified that he, and not Shove, sent out Cut-N-Edge bills and handled customer payments and also testified that Shove did not have checking writing authority as to the Cut-N-Edge bank account.  Apparently, whether authorized or not, Shove did access the Cut-N-Edge bank account, as demonstrated by 4 payments that appeared to have been drawn on the account by Shove and without Mychal's knowledge or authority.  When confronted with those payments at trial, Mychal was visibly taken aback.

Relying largely on the April 2015 letter and the payments made by Shove from the Cut-N-Edge bank account, Hernandez argues that Cut-N-Edge is, in reality, a reincarnation of Rick's Complete and owned not by Mychal, but by Shove.  Therefore, Hernandez says, Shove has been concealing his ownership interest in the business, including his interest in the business assets and income received from the business, warranting a denial of discharge under § 727(a)(2)(A).

The Court is persuaded that Mychal, and not Shove, actually owns Cut-N-Edge.  As to the April 2015 letter, the Court believes Shove's testimony that, regardless of the characterization in the letter that Rick's Complete was simply changing its name, in reality, Shove was attempting to

16

funnel Rick's Complete customers to Mychal's separately owned business as Rick's Complete ceased operations. And while Shove assists Mychal with Cut-N-Edge operations and likely has some influence over Mychal, the evidence presented demonstrates that Mychal operates Cut-N-Edge as his own, separate, sole proprietorship, as evidenced by Mychal's tax returns, d/b/a certificate from Lenox, and separate business bank account. Based on Mychal's credible testimony, the Court finds that Shove's use of the Cut-N-Edge bank account was without Mychal's knowledge or informed consent. In addition, no evidence was presented to suggest that Shove controlled Cut-N-Edge's non-monetary assets, incurred debt or expenses for Cut-N-Edge, or commingled his own funds in and/or openly or regularly paid personal expenses from the Cut-N-Edge account. In sum, the Court finds that Hernandez has failed to establish by a preponderance of the evidence that Shove, and not Mychal, owned Cut-N-Edge. Therefore, a concealment of that (non-existent) ownership cannot form the basis for a denial of discharge under § 727(a)(2)(A).

### d.    Financial Records

Hernandez says that Shove should also be denied a discharge under § 727(a)(2)(A) on account of his concealment of financial records and documentation regarding his rental income and landscaping business. This argument succeeds only if the Court finds that the records and financial information allegedly concealed constitute the type of "property of the debtor" referenced in § 727(a)(2)(A).

Beginning with the Bankruptcy Act, the Supreme Court has construed the term "property" in the bankruptcy context

> "most generously" for the purpose of protecting the creditors of the bankrupt. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Generally speaking, it is "anything of value-anything which has debt paying or debt securing power." *Pirie v. Chicago Title and Trust Co.*, 182 U.S. 438, 443, 21 S.Ct. 906, 908, 45 L.Ed. 1171 (1901).

*Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 734 (1st Cir. 1982). "There is substantial support in bankruptcy case law for the proposition that such intangible assets as goodwill and overall going concern are valuable and should be preserved for the bankrupt estate." *In re Watman*, 301 F.3d at 12. Generally speaking, a business's financial records and documentation are relevant to determining the value of its goodwill and as a going concern. And concealment may encompass the debtor's withholding of information about an asset in which he or she has an interest and that he or she is duty-bound to reveal. *See R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes),* 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999) and cases cited.

Here, however, the Court has not found that Shove owns Cut-N-Edge and there is no evidence that Shove's rental income is tied to goodwill or going concern as a landlord. Hernandez has failed to articulate how financial records and documentation regarding rental income or Rick's Complete (which ceased operations in 2015) hold value so as to constitute "property" within the meaning of § 727(a)(2)(A). The Court does not find that Shove's alleged concealment of financial records and documentation regarding his rental income and former landscaping business would support a denial of discharge under § 727(a)(2)(A).

Therefore, for the foregoing reasons, the Court rules that Hernandez has failed to establish, by a preponderance of the evidence, that Shove's discharge should be denied pursuant to § 727(a)(2) and will enter judgment in favor of Shove with regard to Count II of the Complaint.

2.    <u>Count III - 11 U.S.C. § 727(a)(3): Concealment, Destruction, Mutilation, Falsification, or Failure to Keep or Preserve Recorded Information</u>

Under § 727(a)(3), the court may deny a debtor's discharge if

The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . .

18

11 U.S.C. § 727(a)(3). "[T]he initial burden is on the party objecting to discharge to prove two things: (i) that the debtor 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information;' and (ii) that the recorded information was information 'from which the debtor's financial condition or business transactions might be ascertained.'" *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116, 120 (Bankr. D. Mass. 2007).

According to Hernandez, Shove's discharge should be denied as the result of Shove's destruction of records, concealment of records, and failure to keep adequate records relating to Rick's Complete, Cut-N-Edge, and the rental properties.

a.      *Pre-Fire Records*

Shove testified that, prior to December 2015, Shove kept paper copies of business records related to Rick's Complete and the rental properties in boxes stored in the basement of the Residence.  On December 27, 2015, a fire in the basement destroyed a portion of the hard copy records (the "Fire").  Shove says that the records that were not destroyed by the Fire itself were left severely damaged and unusable by water and ice.  In the Complaint, Hernandez alleges that the pre-Fire records were not all destroyed by fire, water, or ice, but were actually destroyed by Shove in the aftermath of the Fire.  When addressing post-Fire pictures that appeared to show boxes of stored records remaining after the Fire, Shove credibly testified that those pictures (taken by or for Shove's insurer) do not depict the full extent of the water and ice damage.  There is no evidence that Shove was responsible for the Fire, water, and ice damage that destroyed the records[11] and the Court finds that the lack of pre-Fire records does not warrant a denial of Shove's discharge under § 727(a)(3).

---

[11] Both local governmental authorities and Shove's homeowner's insurance provider conducted investigations regarding the Fire.  No charges were issued against Shove and the Shoves' insurance claim was paid in full.

### b.    Electronic Records

Shove testified that he also stored electronic records related to Rick's Complete, including customer lists and customer billing information, on a computer located in the Residence.   In Shove's responses to Hernandez's discovery requests propounded in the Superior Court litigation, Shove simply stated that *all* business records were destroyed in the Fire.   Pl. Ex. 11, 12.   Shove told the Trustee, however, that the electronic records were irretrievable because his computer had been disabled by a virus attack.   Regardless of any discrepancies regarding the demise and/or status of Shove's computer, the Court believes Shove that the electronic business records are irretrievable.

Furthermore, the Court finds that the electronic records (customer and billing information related to a business that ceased operations in 2015) would not be particularly helpful in ascertaining Shove's financial condition or business transactions as relevant to Shove's bankruptcy case.   Shove did provide copies of Rick's Complete bank account statements for November 2013 through September 2015 (when the account was closed), Pl. Ex. 3, 1-108, as well as income tax returns for Rick's Complete from 2013 to 2015.   Pl. Ex. 40-42.   In light of the information that Shove did provide, the Court finds that any electronic records are not pertinent to ascertaining Shove's relevant financial condition or business transactions.   Accordingly, the Court does not find that Shove's discharge should be denied under § 727(a)(3) on account of any failure to preserve electronic records.

### c.    Cut-N-Edge Records

Hernandez argues that Shove's discharge should be denied on grounds that Shove concealed, destroyed, mutilated, falsified, or failed to keep or preserve business records related to

Cut-N-Edge. This argument is based on Hernandez's assertion that Cut-N-Edge is, in reality, a reincarnation of Rick's Complete and owned by Shove. Because the Court has previously rejected that assertion, the Cut-N-Edge records are irrelevant and do not form a basis for the denial of Shove's discharge under § 727(a)(3).

### d. Post-Fire Records

Although the lack of records for the period preceding December 2015 has been adequately explained, Shove has not justified the wholesale failure to keep records regarding his financial affairs for the post-Fire period.[12] "Congress's evident purpose in enacting section 727(a)(3) was to give interested parties and the court a reasonably complete picture of the debtor's financial condition during the period prior to bankruptcy." *Harrington v. Simmons (In re Simmons),* 810 F.3d 852, 857 (1st Cir. 2016) (citing *Tucker v. Devine (In re Devine),* 11 B.R. 487, 488 (Bankr. D. Mass. 1981)). The records need not constitute a paragon of bookkeeping; the applicable standard is one of "reasonableness in the particular circumstances." *In re Schifano,* 378 F.3d at 68. "A debtor must have records which sufficiently identify transactions to permit inquiry about the debtor's financial status and to ascertain a complete and accurate picture of the debtor's financial affairs, including a debtor's business as well as personal finances and activities." *Northeast Cmty. Bank v. Manfredonia (In re Manfredonia),* 561 B.R. 1, 18 (Bankr. D. Mass. 2016) (citing *In re Schifano*, 378 F.3d at 69-70).

The Shoves did not keep records of rental payments following the Fire. Most of the rental income received, whether in cash or by check, was not deposited into a bank account, but was collected and kept in the glove box of Kathleen's vehicle, a drawer in the Shoves' kitchen, or a

---

[12] While Kathleen was primarily responsible for keeping the rental property records, the Court concludes that Shove was aware of the quality (or lack thereof) of those records, particularly in light of Hernandez's discovery requests in the pending Superior Court litigation.

hutch in the Shoves' living room.  Shove acknowledged that as of the petition date, Shove had

neither any record of nor ability to discern the amount of cash on hand  And, with regard to the

rental income received, both Shove and Kathleen testified that, in contrast to their pre-Fire practice,

they did not maintain any contemporaneous rental income receipts or records.  Nor are the other

documents or records provided to either the Trustee or Hernandez sufficient to ascertain Shove's

financial condition or business transactions in the post-Fire, pre-filing period.[13]

After being informed that the Shoves dealt primarily in cash in the prepetition period and

did not keep contemporaneous records, the Trustee requested the Shoves' 2017 income tax return

(which was not yet prepared) and rent rolls for all rental properties, so that the Trustee could

ascertain the Shoves' income, expenses, assets, and liabilities.  However, the rent rolls prepared

for the Trustee did not reflect the amount of rental income actually received within any given

month; instead, they indicated the amount of rent that was *supposed* to be received.  Furthermore,

each rent roll includes a statement that the information provided "is a best recollection, as we no

longer keep records" and that "[m]any tenants do not pay regularly or partial pay their rent."  Pl.

Ex. 45.  The Court concludes that the rent rolls do not constitute "records" containing sufficient

information to ascertain Shove's financial condition or business transactions.  The information

contained in the 2017 tax return is similarly unreliable.  Although the return was prepared by a

third person, the information included in the 2017 tax return was based on financial worksheets

filled out by Shove and was not completed with the aid of actual financial records. Pl. Ex. 44.

Shove testified that some post-Fire rental income was deposited into two bank accounts –

---

[13] Airbnb income, other than the December 12, 2017 deposit into Mychal's account, was directly deposited
into the 6134 account.  Relevant account statements covering January 1, 2017 through November 30, 2017,
(which were provided to the Trustee) show Airbnb deposits consistent with the 2017 Airbnb income amount
disclosed by Shove.  The Court concludes that Shove has provided sufficient financial information
regarding Airbnb income derived from the Residence via the 6134 account statements.  References to rental
income for purposes of further discussion regarding Count III do not include Airbnb rental income.

the 6134 account and a Berkshire Bank account ending in 713, which the Shoves refer to as the "Mission Management" account.  Shove testified that the 6134 account contained automatic deposits from Airbnb and Kathleen's employer, and "no other money that would come in except for tenants."  Trial Tr. 206:2-207:12, Feb. 26, 2020 ("Feb. 26 Tr.").  But at trial, Shove was unable to verify which deposits into the 6134 account reflected rental income.  For example, when asked to confirm that a March 10, 2017 deposit in the amount of $459.51 with no identified source or payor was rental income, Shove could only verify that the deposit could be a rent payment "with something mixed in."  Feb. 25 Tr. 58:7.  Shove testified that, for rental income that was deposited, the Shoves more often used the Mission Management account.

However, taken together, the 6134 account and the Mission Management account statements are not consistent with the rent rolls and of course fail to verify the undeposited cash rent receipts.  For example, the June 2017 Mission Management statement, Pl. Ex. 3, 271, shows total deposits of $3,300, and the June 2017 6134 account statement shows no deposits other than from identifiable non-tenant sources, Pl. Ex. 3, 529-536.  But the June 2017 rent roll lists total rental income of $4,525.  Pl. Ex. 45.  The August through November 2017 Mission Management account statements show no activity, Pl. Ex. 3, 273-276, and the 6134 account statements from October through November 2017 show a sole deposit, in the amount of $1,250, not from identifiable non-tenant sources, Pl. Ex. 3, 557-572.  But the rent rolls list rental income of $3,075 for October 2017 and $4,075 for November 2017.  Pl. Ex. 45.  It is clear that Shove's bank account statements do not corroborate the rent rolls, do not provide an accurate record of Shove's actual rental income, and do not trace the flow of rental income.

Regarding rental expenses, Shove testified that the Shoves retained and stored hard copies of bills from 2016 forward, such as utility bills, in boxes.  The Trustee recalled receiving copies

of some receipts for real estate tax payments made to the town of Lenox but the copies of bills and

expense information Shove provided, when compared with the Shoves' bank account statements,

do not sufficiently explain the use and disposition of Shove's rental income. Furthermore, because

Kathleen often paid expenses in cash or by money order from cash on hand, Shove's bank account

statements do not provide an accurate record of Shove's actual rental expenses either.

While the Trustee acknowledged that the Shoves were for the most part responsive to his

concerns and information requests, this Court may find that a denial of discharge is warranted

under § 727(a)(3) even if the debtor did not conceal or fail to keep records with ill intent. *See State

Bank of India v. Sethi (In re Sethi),* 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000). Here, the Court

concludes that Shove failed to keep accurate and adequate records of his post-Fire rental income

and expenses from which Shove's total net rental income, rental accounts receivable, rental

expenses, and cash on hand could be ascertained.

Once a plaintiff shows by a preponderance of evidence that the debtor failed to keep or

preserve financial records within the meaning of § 727(a)(3), the debtor has the burden of

establishing that either the debtor *did* maintain adequate books and records or that the failure to do

so was justified under the circumstances. *Cohen Steel Supply, Inc. v. Fagnant (In re Fagnant),*

No. 03-10496-JMD, 2005 WL 1244866, *3 (Bankr. D.N.H. Apr. 14, 2005) (citations omitted),

*aff'd,* 337 B.R. 729 (B.A.P. 1st Cir. 2006). To prevail on a justification defense, the debtor's

asserted justification must be objectively reasonable – "the standard is that of a reasonably prudent

person in the same or similar circumstances." *In re Simmons,* 810 F.3d at 858 (citing *In re Schifano*,

378 F. 3d at 68; *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)). When determining

whether a debtor's inadequate records are justified under the circumstances, the court should

consider the debtor's education, sophistication, experience, and volume of business. *Meridian*

*Bank*, 958 F.2d at 1231.

> When examining the debtor's circumstances, courts have focused on several factors, including:
>
> 1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
>
> 2. The amount of the debtor's obligations;
>
> 3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
>
> 4. The debtor's education, business experience and sophistication;
>
> 5. The customary business practices for record keeping in the debtor's type of business;
>
> 6. The degree of accuracy disclosed by the debtor's existing books and records;
>
> 7. The extent of any egregious conduct on the debtor's part; and
>
> 8. The debtor's courtroom demeanor.

*Massachusetts v. Sohmer (In re Sohmer)*, 434 B.R. 234, 257 (Bankr. D. Mass. 2010) (quoting

*Christy v. Kowalski (In re Kowalski),* 316 B.R. 596, 601–02 (Bankr. E.D.N.Y. 2004)).

Shove owned and managed a total of approximately 90 rental properties since 1996 and operated Rick's Complete for at least 25 years.  In contrast to their pre-Fire practice, the Shoves failed to retain rental income receipts or document rental income and expenses after the Fire. Particularly in light of Shove's lengthy history as a business and rental property owner, the Shoves' change in practice regarding rental income and expense records after the Fire (and while Hernandez's Superior Court case was pending), the ease by which Shove could have recorded rental receipts and expenses, and Shove's demeanor as a witness, the Court finds that Shove's post-Fire failure to keep accurate records of rental income and expenses was unreasonable and not justified under all of the circumstances of the case.  Consequently, the Court rules that Shove's

discharge should be denied pursuant to § 727(a)(3) and will enter judgment in favor of Hernandez as to Count III of the Complaint.

        3.      <u>Count IV - 11 U.S.C. § 727(a)(4)(A): False Oath or Account</u>

"The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Matter of Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974). As a result, pursuant to § 727(a)(4)(A), a debtor may be denied a discharge if

      (4) the debtor knowingly and fraudulently, in or in connection with the case –

          (A) made a false oath or account . . . .

11 U.S.C. § 727(a)(4)(A). To support a request for denial of discharge under § 727(a)(4)(A), the plaintiff must prove by a preponderance of the evidence that (1) the debtor knowingly and fraudulently made a false oath and (2) the false statement relates to a material fact. *See In re Tully*, 818 F.2d at 110; *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 837 (B.A.P. 1st Cir. 2011). "[T]he burden of proof rests with the [plaintiff] but once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not committed the offense charged." *In re Tully*, 818 F.2d at 110 (internal quotation marks omitted).

The fraudulent intent requirement of § 727(a)(4)(A) may be "satisfied by a showing of reckless disregard for the truth." *Singh Educ. Servs. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013); *see also Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir. 1994); *In re Tully*, 818 F.2d at 112 ("reckless indifference to the truth" has "consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)"). Put another way, "not caring whether some representation is true or false – the state of mind known as "reckless disregard"" – is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material. *In re Chavin*,

150 F.3d 726, 728 (7th Cir. 1998) (citing *In re Yonikus,* 974 F.2d 901, 905 (7th Cir.1992); *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir.1992); *In re Tully*, 818 F.2d at 111).

"The subject matter of a false oath is material . . . if it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property.'" *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 272 (Bankr. D. Mass. 2012) (quoting *In re Tully*, 818 F.2d at 111) (external quotations omitted). The materiality threshold is "fairly low," *Premier Capital, LLC v. Crawford (In re Crawford)*, 841 F.3d 1, 8 (1st Cir. 2016), and is not dependent on whether a creditor can even reach an asset or whether omitted entirely. *See, e.g.*, *In re Crawford*, 841 F.3d at 9 ("[d]espite disclosing the value, [the First Circuit Court of Appeals] regarded the excluded IRA information as material"); *JP Morgan Chase Bank, N.A. v. Koss (In re Koss)*, 403 B.R. 191, 212 (Bankr. D. Mass 2009) ("[t]he disclosure of personal property in one's bankruptcy schedules is material, [regardless] of a debtor's personal valuation, as it involves the existence and discovery of potential assets for estate disposition"). In addition, "a debtor cannot claim that he omitted an asset because it had little or no value." *In re McCarthy*, 488 B.R. at 828; *see also In re Sohmer,* 434 B.R. at 253 (asserting that a bank account has a nominal or no balance does not save a debtor from the consequences of § 727(a)(4)).

In the Complaint, Hernandez generally alleges that Shove knowingly and fraudulently made numerous false oaths in his schedules and statements. In Hernandez's post-trial brief, however, he asserts more specifically that Shove made false oaths within the meaning of § 727(a)(4)(A) regarding ownership of a safe deposit box, the prepetition existence of a storage unit, Shove's alleged ownership of Cut-N-Edge, the McDowell debt and mortgages, the transfer of property to a self-settled trust, a debt owed to Berkshire Christian School, the Airbnb rental

income, real property located in Polk County, Florida, and an E-trade account. Shove largely disputes having made false oaths as Hernandez claims, and, where errors in the schedules and statements have been established, argues that those errors were justified and/or made without fraudulent intent.

a.    <em>Safe Deposit Box</em>

In their Statement of Financial Affairs ("SOFA"), the Shoves indicated that they did not have a safe deposit box within the year prior to the bankruptcy filing. Hernandez says this was a false oath since the Shoves' 2016 income tax return includes a tax deduction for a safe deposit box.

At trial, Shove insisted that the SOFA was accurate and that he did not own, and never had owned, a safe deposit box. When shown the Shoves' 2014 through 2016 federal income tax returns, Pl. Ex. 41-43, which each list a post office box address for the Shoves' home address and include a safe deposit box expense among the itemized deductions, Shove surmised that the tax return preparer may have erroneously described Shove's post office box expense as a safe deposit box expense. Shove further testified that he had not reviewed the Shoves' entire tax returns before electronically signing the returns.

The overwhelming evidence demonstrates that Shove has long used a post office box address for business purposes. However, the 2014 through 2016 tax returns do not include an itemized deduction for a post office box. Hernandez presented no other evidence that Shove owned a safe deposit box, and Shove's testimony on this issue was credible. The Court finds it most probable that the Shoves' tax preparer erroneously included an itemized deduction for a safe deposit box instead of Shove's post office box on the tax returns and that the statement in the SOFA was accurate and not grounds for denial of discharge under § 727(a)(4)(A).

28

b.      *Storage Unit*

After the Fire, according to Shove, the Shoves rented a "POD" storage unit from December 2015 through September 2017 to store household items.  The storage unit was located in the yard behind the Residence.  On the SOFA, in answer to question 22, which asks "Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?," the Shoves answered "No."  Hernandez argues that this answer constituted a false oath in connection with the bankruptcy case sufficient to deny Shove's discharge under § 727(a)(4)(A).

Shove, however, says that he answered truthfully based on his interpretation of the question.  According to Shove, he believed that the question referred only to storage units that were located in a "place other than your home" and considered the yard behind the Residence to be part of his "home" as referred to in question 22.  Feb. 26 Tr. 51:12-22.

Regardless of whether Shove's interpretation of question 22 is ultimately accurate, the Court finds that the interpretation was not unreasonable.  Therefore, Shove's indication in the SOFA that he did not store property in a storage unit or place other than the home was neither knowingly false nor made with a reckless disregard for the truth and cannot form the basis for a denial of discharge under § 727(a)(4)(A).

c.      *Cut-N-Edge*

Because Hernandez argues that Cut-N-Edge is, in reality, owned by Shove and not Mychal, Hernandez says that Shove's failure to disclose his ownership of Cut-N-Edge and include the business assets and income in his bankruptcy documents constitutes a material false oath under § 727(a)(4)(A).  However, as previously discussed, the Court has found that Shove does not own Cut-N-Edge and, consequently, the bankruptcy statements and schedules are accurate in that

29

regard.

But Hernandez also contends that Shove's description of himself in Schedule I as a "manager" of Cut-N-Edge was also false and warrants a denial of discharge under § 727(a)(4)(A). While Mychal testified that he did not consider Shove to be a "manager" of Cut-N-Edge, the testimony is consistent that Shove was involved in the business, including communicating with clients, providing job quotes, and obtaining some building permits.  It is apparent that Mychal and Shove never formalized Shove's work for Cut-N-Edge with a formal job title, but given Shove's involvement in the business, the Court does not conclude that Shove's characterization of his role in the business was made falsely or with reckless disregard for the truth.  Furthermore, the amount of income received from that work was disclosed on Schedule I, rendering the accuracy of Shove's self-assigned job title immaterial.  Accordingly, the Court finds that Shove's characterization of himself as a "manager" of Cut-N-Edge is not a basis for denying his discharge under § 727(a)(4)(A).

### d.   McDowell Debt and Mortgages

Hernandez argues that Shove made false oaths related to the McDowell mortgages within the meaning of § 727(a)(4)(A).  First, Hernandez says that Shove did not owe any debt to McDowell and the indication otherwise on Schedule D is false.  Second, Hernandez says that Shove made a false oath on the SOFA when he failed to disclose the McDowell mortgages in answer to question 18, which requires a debtor to disclose transfers of property outside the ordinary course of business within the 2 years prior to the bankruptcy filing.

The debt and mortgages to McDowell are listed in Schedule D – a $65,000 joint mortgage obligation to McDowell secured by 10 Crystal Street, a $70,000 joint mortgage obligation to

McDowell secured by 7 Crystal Street, and a $50,000 mortgage obligation of Kathleen only[14] to McDowell secured by 12 Crystal Street.

Shove testified that McDowell first gave the Shoves "a chunk of money" in 1994 to assist with the purchase of real property described as "12A-12B Crystal Street." Feb. 26 Tr. 83:1-2. Shove further testified that later in the 1990s, McDowell financially assisted Shove's purchase of a rental property referred to as "716 North Street," contributed a portion of the down payment for the purchase of 524 Walker Street, and purchased equipment for the Shoves' former restaurant. Those monetary contributions were not memorialized in contemporaneous writings such as promissory notes or other written indications of debt. Despite the lack of written documentation, Shove testified that he considered the moneys received from McDowell to be a debt and allowed McDowell to reside in one of the Shoves' rental units for years without paying rent, which Shove considered a form of partial repayment.

It was not until May 6, 2016 that the alleged debt to McDowell was reduced to writing by Kathleen in the form of 3 promissory notes (signed by Kathleen only) and the McDowell mortgages (also executed only by Kathleen). Kathleen testified that it was McDowell who determined the amount of the debt and Shove confirmed that he had a general sense of the total amount that McDowell gave to the Shoves over many years, trusted McDowell, and did not question the amounts listed in the McDowell notes.

While the timing of the execution of the McDowell promissory notes and mortgages is suspect (having been executed shortly after Shove received notice that Hernandez was seeking a real estate attachment), the Court found the testimony regarding the existence, though perhaps not the accuracy of the amount, of the McDowell debt to be largely credible. In addition, at this

---

[14] During the trial, Shove testified that listing the $50,000 obligation to McDowell in Schedule D as owed solely by Kathleen was erroneous and that he was also responsible for that debt.

juncture, the amount of the debt owed to McDowell is not material, as no proof of claim has been filed and the Trustee has not attempted to liquidate any of the properties subject to the McDowell mortgages.

As to the Shoves' SOFA response that they did not transfer any property outside the ordinary course of their business or financial affairs within 2 years prior to the bankruptcy filing, that representation is clearly false. Shove testified that as of the filing date, Shove was aware that Kathleen had granted mortgages to McDowell but did not consider that action to be a transfer of an interest in property or a payment of a debt. However, question 18 of the SOFA clearly requires a debtor to "[i]nclude both outright transfers and transfers made as security (*such as the granting of a security interest or mortgage* on your property)." (emphasis supplied) While the answer to this question is obviously false or made with reckless disregard to the truth as to Kathleen, the Court finds that the statement is not false, nor is it material, with regard to Shove. As previously discussed, the McDowell mortgages encumbered only Kathleen's, and not Shove's, interest in the properties. Accordingly, as to the transfer of any of Shove's interest in property, the answer was correct and Kathleen's incorrect answer is not material to Shove's property interests. Therefore, the Court finds that the characterization of the McDowell debt and mortgages in the schedules and SOFA do not constitute false oaths sufficient to deny Shove a discharge under § 727(a)(4)(A).

> e.   *Airbnb Income*

In his post-trial brief, Hernandez argues that Shove's discharge should be denied for failure to adequately disclose income received from the Airbnb rental of a portion of the Residence. But as previously discussed, the Court finds that the Airbnb income was included in the rental income disclosed on Schedule I and corroborated by the bank account statements. With specific regard to the Airbnb income, the Court finds that Hernandez has failed to establish, by a preponderance of

the evidence, that Shove made a false statement within the meaning of § 727(a)(4)(A).

      *f.*  *EJM Trust*

  In April 2010, Shove purchased property in Floral City, Florida from Gold Dome

Investments, Inc. ("Gold Dome") and had the property transferred to a trust referred to as the "EJM

Trust." The EJM Trust agreement[15] named Gold Dome as the "Grantor(s)/Settlor(s)," Mychal (a

high school student at the time) as the trustee, and Shove as the beneficiary. Pl. Ex. 59. Shove

could not recall the exact amount paid for the property, but believed it to be either $15,000 or

$18,000. Paragraph 17 of the trust agreement provided that the "beneficiary who assigns his

interests in full shall forever waive his right to revoke this trust agreement" and assigns the "power

of direction and revocation" of the trust agreement along with the beneficial interest. Pl. Ex. 59.

  In December 2010, Shove signed an amendment to the EJM Trust agreement transferring

the beneficial interest in the trust to his daughter and son-in-law as a wedding gift. Pl. Ex. 61. The

transfer was also memorialized in a gift letter. Pl. Ex. 62. After the transfer, according to Shove,

his daughter and son-in-law paid some expenses related to the property, while at other times both

Shove and Mychal paid trust-related expenses.

  In answer to question 19 of the SOFA – "Within 10 years before you filed for bankruptcy,

did you transfer any property to a self-settled trust or similar device of which you are a

beneficiary?" – the Shoves responded "No." Hernandez says that this response constitutes a false

oath within the meaning of § 727(a)(4)(A) because the EJM trust is a self-settled trust to which

Shove *had* transferred property within the 10 years prepetition. Shove claims that the response

was accurate because he did not think that the EJM Trust was a self-settled trust and because he

---

[15] Shove testified that the original signed EJM trust documents were destroyed in the Fire, and both Mychal
and Shove testified that only an unsigned copy of the trust agreement could be located. The Court accepts
the unsigned trust agreement as evidence of the terms of the EJM trust. *See* Pl. Ex. 59.

transferred his beneficial interest to his daughter and son-in-law in 2010.

A self-settled trust is "[a] trust in which the settlor is also the person who is to receive the benefits from the trust, usu[ally] set up in an attempt to protect the trust assets from creditors." Restatement (Second) of Trusts § 156 (1959).  In determining which person or entity is properly considered the "settlor" of a trust, a court should look to the "reality" of the situation, as "[t]he person who provides the consideration for a trust is the settlor even if another person or entity nominally creates the trust."  *Lassman v. Tosi (In re Tosi)*, 383 B.R. 1,13 (quoting *Brooks v. Interfirst Bank, Fort Worth (In re Brooks),* 844 F.2d 258, 263 (5th Cir.1988)).  While the EJM Trust agreement names Gold Dome as the "Grantor(s)/Settlor(s)" and Shove as the beneficiary, Shove paid for the property and had it placed into the EJM Trust via deed from Gold Dome. Inasmuch as Shove provided the consideration for the property transferred to the EJM Trust, the Court finds that Shove is likely more properly characterized as both the settlor as well as the original beneficiary, and the EJM Trust would likely be found to be a self-settled trust.

Even if the EJM Trust were determined to be a self-settled trust within the meaning of question 19 of the SOFA, however, the Court does not find that Shove's response to that question was knowingly false or made with a reckless disregard for the truth.  Shove credibly testified that the EJM Trust was the first, and only, trust that he created, that he was not versed in the law governing trusts, and that he was not aware that the EJM Trust may be considered a "self-settled" trust.  Furthermore, the testimony and evidence all support Shove's stated belief that, as of the petition date, Shove no longer held any beneficial interest in the EJM Trust.

Shove's counsel insisted that the EJM Trust was not a self-settled trust while Hernandez's counsel repeatedly insisted that it was.  With counsel's dueling characterizations of the EJM Trust in the backdrop, Shove only conceded that he did not know whether the EJM Trust constituted a

self-settled trust.  Shove did not deny the existence of the trust, nor did he deny transferring his

beneficial interest in the EJM Trust to his daughter and son-in-law in the 10 years proceeding his

bankruptcy filing.  Taking all these facts into consideration, the Court cannot find that Shove's

answer to question 19 of the SOFA, even if objectively inaccurate (which the Court does not, and

need not, determine), was not a knowingly false statement or a statement made with reckless

disregard for the truth, and therefore does not constitute grounds for denial of discharge under

§ 727(a)(4)(A).

<em>g.    BCS Debt</em>

Shove testified that as of the petition date, 2 of the Shoves' children attended Berkshire

Christian School ("BCS"), a private school that charged tuition.  Despite the fact that a BCS

statement dated June 2018 indicated that the tuition balance for BCS was $8,440.92 as of October

2017, Pl. Ex. 54, the Shoves did not include BCS as a creditor on Schedule E/F, nor did they

include BCS on the creditor matrix.  Hernandez argues that, on the petition date, Shove owed a

general unsecured debt to BCS on account of tuition for the 2017-2018 school year and that

Shove's failure to disclose that debt constitutes a false oath under § 727(a)(4)(A).

In response, Shove contends that he did not view the BCS tuition as a "debt," but rather an

ongoing monthly expense "like an electric bill," Feb. 26 Tr. 20:21.  Shove also testified that the

Shoves often fell behind with BCS tuition payments and would then incur interest charges on the

past due amount.  According to Shove, BCS had put the Shoves on a tuition payment plan for the

school year, allowing the Shoves to pay the yearly tuition over time, at approximately $900 per

month.  Consequently, Shove stated that the BCS tuition was included as an expense in Schedule

J and not as a debt in Schedule E/F, which he discussed with his attorney when he signed his

bankruptcy schedules.  Kathleen likewise testified that the BCS monthly tuition payment was

35

included in the $1,644 "childcare/education costs" listed on the Shoves' Schedule J. The Shoves also included a statement on Schedule J that they anticipated their expenses to decrease in the coming year because their children would begin attending public school. And, consistent with the transcript of the Shoves' meeting of creditors, Kathleen testified that the Shoves discussed the BCS tuition payments with Trustee. Def. Ex. 90.

Based on the June 2018 BCS statement, the Court concludes that the Shoves owed a debt to BCS for the 2017-2018 school year tuition at the time the case was filed, a debt that the Shoves were permitted to pay in installments. But the Court also finds that Shove's inclusion of the monthly tuition payment in Schedule I rather than in Schedule E/F does not constitute a false statement or a reckless disregard for the truth under § 727(a)(4). Especially in light of the statement on the June 2018 BCS statement that "[t]uition [i]nstallments must be paid each month and are due on or before the 1st of each month. Interest (1% per month) is applied to [t]uition and [f]ees remaining unpaid after September 1st of the current school year," Pl. Ex. 54, the Court finds that Shove's decision to disclose the tuition payments as a monthly recurring obligation and not a prepetition debt for the entire amount to be reasonable.

In addition, the Court finds that the failure to include the tuition debt on Schedule E/F to be nonmaterial. As the Trustee noted, the large expense for childcare and education costs listed on Schedule J was sufficient to warrant further inquiry, and there is no evidence that Shove failed to provide further information related to the BCS debt after a demand by the Trustee or any other party.[16] Accordingly, the Court finds that Shove adequately disclosed the tuition payments made to BCS and did not knowingly and fraudulently make a false oath or act with reckless disregard

---

[16] To the extent that Hernandez alleges that Shove failed to disclose a potential preferential payment of $1,000 to BCS on the SOFA, the Court finds that assertion unavailing. Because the Shoves' debts were primarily non-consumer debts, the applicable SOFA question only required disclosure of payment(s) to any one creditor within the 90 days preceding the filing that totaled $6,425 or more.

for the truth under § 727(a)(4)(A) by failing to include BCS on Schedule E/F or the creditor matrix.

h.    *Polk County Property*

As he conceded, Shove purchased real property in Polk County, Florida in July 2006 (the "Polk County Property"), remains the owner of the Polk County Property, and failed to disclose the Polk County Property anywhere in the schedules and statements or through testimony at the meeting of creditors.

Shove says that he purchased the Polk County Property through eBay for $10.00, that the property is currently worth only about $1,600, and that the property was not disclosed because Shove simply "forgot all about it." Feb. 26 Tr. 176:8. The Court does not find, however, that Shove merely "forgot" about the Polk County Property sufficient to justify his lack of disclosure. The evidence presented shows that real estate taxes for the Polk County Property were paid out of the Shoves' joint checking account for tax years 2006 through 2009 and 2016. A 2018 real estate property tax bill was also paid, via an "ACH withdrawal" from Mychal's business checking account. However, Mychal credibly testified that Mychal was not aware that Shove owned the Polk County Property, that Mychal had not made any related real estate tax payments on Shove's behalf, and (as previously discussed) that payments from Mychal's business account initiated by Shove were not authorized by Mychal. Accordingly, the Court concludes that the payment of the 2018 Polk County Property real estate taxes was made by Shove. The weight of the evidence leads the Court to conclude that, even if Shove had not remembered the existence of the Polk County Property at the time the schedules and statements were completed and filed with the Court, he did not just "forget" about the Polk County Property after its purchase, as he continued to make real estate tax payments. At least by the time he paid the Polk County Property real estate taxes in 2018, Shove had "remembered" the existence of the property and still failed to amend his schedules

to reflect his ownership in the property or to make any effort to disclose the existence of the property to the Trustee.

Regardless of the actual value of the Polk County Property, Shove had a duty to disclose the property in his schedules and statements either when initially filed or through later amendment or, at the very least, to disclose the existence of the property by other means to the Trustee.

Accordingly, the Court finds that Shove made a false oath within the meaning of § 727(a)(4), whether by acting with actual intent or in a recklessly indifferent manner, by failing to disclose at any point in connection with his bankruptcy case, his ownership of the Polk County Property.

### i.    *E-Trade and Other Bank Accounts*

Shove admitted that he failed to disclose anywhere in his schedules and statements, or through testimony at the meeting of creditors, his ownership of an E-trade account (the "E-Trade Account") which he had used for purchasing and trading stocks. Shove admitted that he did not forget about the existence of the E-Trade account, but instead made a conscious decision to omit the account because he had last used the account for stock trades 7 years ago and the account balance was only $2.31. In addition, at trial, Shove further revealed that he intentionally failed to disclose other bank accounts due to inactivity. Following the trial, Shove has failed to file amended schedules and/or statements to disclose the omitted E-Trade and other bank accounts.

Regardless of Shove's belief that the E-Trade and other bank accounts need not have been disclosed on account of inactivity or de minimus value, the failure to disclose those accounts was not only purposeful, but also material. The obligation to disclose *all* assets, regardless of the debtor's assessment of the assets' value, is vital to ensure that interested parties, and especially bankruptcy trustees, have sufficient disclosure to make an independent determination of the value

of the debtor's assets to the bankruptcy estate.

Shove's failure to disclose the E-Trade account and other bank accounts prevented the Trustee from asking for relevant account statements and evaluating the existence and import of any transfers to or from the accounts in the prepetition period. For instance, despite Shove's testimony that he had not used the E-Trade account for stock trades for many years, the evidence reveals that in January 2015, a transfer of $14,000 was made from a Rick's Complete bank account to the E-Trade account, Pl. Ex. 3, 83, but only a little over $2 remained in the account by the time the case was filed. Shove's lack of disclosure prevented the Trustee from further inquiring about provenance and disposition of that $14,000 in the prepetition period.[17]

Because the Court finds that Shove knowingly, and either with actual fraudulent intent or with a reckless disregard for the truth, failed to disclose the existence of the E-Trade and other bank accounts in the schedules and statements as initially filed, failed to amend the schedules and statements to disclose the omitted accounts, and failed to otherwise disclose the existence of the accounts to the Trustee, the Court rules that Hernandez has established, by a preponderance of the evidence, that Shove made a false oath within the meaning of § 727(a)(4)(A), that the false oath was material to the bankruptcy case, and that Shove should accordingly be denied a discharge pursuant to § 727(a)(4)(A). Therefore, on account of Shove's failure to disclose the Polk County Property and the E-Trade and other bank accounts, the Court will enter judgment in favor of Hernandez on Count IV of the Complaint.

---

[17] Shove and Kathleen each testified that the $14,000 deposit from the Rick's Complete bank account into the E-Trade account in January 2015 was related to a settlement payment to Kathleen on account of a claim related to a Volkswagen vehicle. However, as reflected in a statement from the 6134 Account, the Volkswagen settlement payment was deposited in the 6134 Account in 2017. Pl. Ex. 1A, 120.

III.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court will issue judgment in favor Shove on Counts I

and II of the Complaint, but will enter judgment in favor of Hernandez on Counts III and IV,

denying Shove's discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (4).  A separate judgment in

conformity with this Memorandum will issue forthwith.

By the Court,

Dated: May 10, 2021

Elizabeth D. Katz
United States Bankruptcy Judge